**UNITED STATES of America, Appellee,**

v.

**Edwin L. SCHMITT, Appellant.**

No. 85–2525.

United States Court of Appeals,
Tenth Circuit.

June 18, 1986.

Donald W. MacPherson, Lawrence N. Bazrod, MacPherson & McCarville, Phoenix, Ariz., for appellant.

Jackie N. Williams, Asst. U.S. Atty., Benjamin L. Burgess, Jr., U.S. Atty., Wichita, Kan., for appellee.

Before LOGAN, MOORE and TIMBERS *, Circuit Judges.

TIMBERS, Circuit Judge.

Edwin L. Schmitt ("appellant") appeals from a judgment of conviction, entered October 4, 1985 after a jury trial during August 1985 in the District of Kansas, Sam A. Crow, *District Judge*, for willful failure to file individual income tax returns for the years 1979, 1980 and 1981, in violation of 26 U.S.C. § 7203 (1982).

A grand jury returned a three-count indictment on December 18, 1984. Appellant conceded that he did not file income tax returns for the three years involved. As an aircraft design engineer, appellant received wages of $49,213, $57,969, and $52,321 for the three years, respectively. His unconvincing defense at trial was that he believed in good faith that wages were not considered income under the tax laws. Following the jury verdict of guilty on each of the three counts, the court sentenced him to one year imprisonment and a $1,000 fine on Count I; to one year imprisonment and a $1,000 fine on Count II, the prison sentence on Count II to run consecutively to the prison sentence imposed on Count I; and to one year imprisonment and a $1,000 fine on Count III. The prison sentence imposed on Count III was ordered suspended and appellant was placed on probation for a period of three years on that count, to commence upon his release from prison under Counts I and II. Pursuant to 18 U.S.C. § 4205(f) (1982), the court ordered that appellant serve one-third of his prison sentence. At the time of oral argument before us, we were informed that appellant had completed his prison sentence and was

* Of the Second Circuit, by designation.

in a half-way house; but we were not informed whether appellant had paid his fine.[1]

Appellant's primary claim of error on appeal is that his Fifth Amendment privilege against self-incrimination was violated because the prosecutor, during examination of witnesses and in summation, commented on appellant's silence during meetings with Internal Revenue Service ("IRS") personnel. We hold that, even if we were to assume arguendo that the prosecutor's comments violated appellant's Fifth Amendment privilege, such comments were harmless under the circumstances of this case.

A subordinate claim of error is raised regarding the admissibility of evidence of appellant's tax liability in this failure to file case.

We affirm the judgment of conviction.

## I.

Turning to appellant's Fifth Amendment claim, we shall examine first the conversations which appellant asserts triggered his Fifth Amendment privilege; then we shall discuss the application of the harmless error doctrine in this case.

(A) *Conversations Alleged To Have Triggered Appellant's Fifth Amendment Privilege*

Appellant asserts that in three of his meetings with IRS personnel during the investigation that preceded his indictment, he received government assurances akin to warnings under *Miranda v. Arizona,* 384 U.S. 436 (1966), that his silence would not be used against him in subsequent proceedings. He argues therefore that the prosecutor improperly alluded at trial to his failure to produce records and to his failure to inquire of IRS personnel whether his

wages were considered income under the tax laws.

In February 1981 the IRS began investigating appellant's failure to file income tax returns. He responded in letters and telephone conversations that he did not believe his wages were income. The first meeting at which appellant claims he received government assurance that his silence would not be used against him was the November 25, 1981 meeting at the IRS office in Wichita with Revenue Agent Terry Schneider of the Examination Division. The purpose of the meeting was to determine whether appellant was required to file tax returns for 1979 and 1980. Appellant asked Schneider if the proceedings could result in criminal charges. Schneider responded "that it was possible, but not usually." Appellant then requested that Schneider grant him immunity, to which Schneider explained that he did not have authority to do so. This discussion clearly did not amount to government assurance that appellant's silence would not be used against him. The revenue agent's explanation of possible future proceedings was equivocal, unlike *Miranda* warnings. Schneider did not explain particular legal rights, nor did he mention any privilege against self-incrimination. Moreover, this conversation took place at an investigatory stage of the proceedings. Schneider was a revenue agent in the civil division of the IRS. Appellant was not in custody at the time. He was not subjected to postarrest interrogation.

The second meeting with IRS agents during which appellant claims his Fifth Amendment privilege against self-incrimination was triggered took place on May 5, 1982. Appellant met with Revenue Agent Sam Seward and his acting group manager, George Hoffman. Seward had asked appellant to produce books and records for the 1979 and 1980 tax years. At this meet-

---

1. At oral argument, appellant withdrew his claim that the district court abused its discretion in sentencing appellant to prison whereas others found guilty of violating § 7203 were placed on probation. We note, however, that the sentence imposed was within the statutory limits for violations of § 7203. *See United States v. Floyd,* 477 F.2d 217, 224 (10th Cir.), *cert. denied,* 414 U.S. 1044 (1973) (a sentence within statutory limits and within discretion of court will not be disturbed by reviewing court).

ing, appellant stated that he might not wish to answer some questions and inquired about possible self-incrimination. The agents explained that at the time of this meeting the proceedings against appellant were civil in nature. The following discussion, inter alia, took place:

"[Appellant]: Well, you mean that you're telling me that I have to answer these questions that you're asking me? It's a law that says I have to answer these questions or give you these papers or whatever it is that I do?

[Seward]: Well, I'm not sure.

[Appellant]: Is that what that means? I mean, you read that section, but is that what that means?

[Seward]: Is there any reason that you don't want to, to—

[Appellant]: Well, there could be, yes.

[Seward]: Okay. I guess I'm not sure why you're, you know, we have requirements here that you are to provide us your records ([Appellant]: Uh-huh) There may be certain legal rights that you might be entitled to under certain situations. You know, regarding the Constitution, I suppose, you know, as far as self-incrimination or something along that matter ([Appellant]: Uh-huh) but if that's where you're at, I guess you need to tell us that at this point.

[Appellant]: Okay, well, yes, that was certainly on my mind. Simply because it does sound like that we're leading towards something that would certainly try and incriminate me here.

[Seward]: Are you claiming then your Fifth Amendment right?

[Appellant]: Well, not yet. So far, I guess. I still had some more questions. By the way, you know, we did forget one thing, your identifications here.

. . . .

[Appellant]: Uh-huh. So, it's not a criminal type of discussion then?

[Hoffman]: No, it's not.

[Appellant]: You're not in the Criminal Division. I see. Well, see, I guess that's where my confusion comes in because Mr. Schneider said that these things that I say could be used in criminal litigation against me, and you know, that kind of scares me. I don't want like (sic) to think that I'm going to be charged with a crime and that these things are going to be used against me. An[d] you mentioned the Fifth Amendment, of course, that does say that I don't have to give things that's (sic) going to be used against me so that was the reason why I didn't want to give all that stuff up.

[Hoffman]: I—can you explain that to him a little bit, or you want me to attempt to?

[Seward]: Well, as far as Fifth Amendment?

[Hoffman]: Well, no just the Civil vs. Criminal. At this point, we're just trying to determine whether there is a civil liability.

[Appellant]: Uh-huh.

[Hoffman]: And it's true that if you did, you know, (sic) items that you submit to us, if it did become a criminal matter, then it would be in the Revenue Agent's workpapers.

[Appellant]: Uh-huh.

[Hoffman]: But, as far as right now, the only thing that we're really interested in is the civil aspects of the case.

[Appellant]: So the—

[Hoffman]: Determination of tax.—

. . . .

[Appellant] . . . I'm not saying I'm guilty; I am innocent but, but yet there's always that chance that people are going to say that I am and take me to court on it and so I tend, (sic) I think it could tend to incriminate me."

As the agents explained, this meeting centered on the civil aspects of appellant's failure to file tax returns. The references to any constitutional right or privilege which appellant might have were not tantamount to the unequivocal *Miranda* type warning that emphatically assures a person that silence will not be used against him in

a later criminal proceeding and thereby induces a person into silence in reliance on such a guarantee. Significantly, it was *appellant* who raised the self-incrimination issue—not the *agents*.

The third meeting at which appellant claims he received government assurance that his silence would not be used against him presents a closer question. On November 21, 1982 appellant met with IRS Special Agent Cheryl Admire of the Criminal Investigation Division. At the beginning of this meeting, the agent informed appellant that under the Fifth Amendment he could not be compelled to answer questions or to submit information tending to incriminate him. Appellant also was informed that information he furnished could be used against him in a criminal proceeding. Of the three conversations which appellant claims triggered his Fifth Amendment privilege, this third one with Special Agent Admire of the Criminal Investigation Division included representations most closely analogous to *Miranda* warnings.

We need not decide, however, whether Special Agent Admire's statements were equivalent to the government assurances contained in *Miranda* warnings given to a custodial defendant. We find it unnecessary to determine whether appellant's Fifth Amendment privilege was violated in this case, since we are convinced, for the reasons set forth below, that the prosecutor's reference to appellant's failure to produce records and to ask IRS agents about his wages was harmless.

(B) *Harmless Error*

█ It is well settled that where a defendant's silence is induced by government action, such as the giving of *Miranda* warnings, it is improper for a prosecutor to comment on a defendant's invocation of his privilege to remain silent. *See Fletcher v. Weir*, 455 U.S. 603, 605 (1982); *Doyle v. Ohio*, 426 U.S. 610, 618 (1976); *Griffin v. California*, 380 U.S. 609, 615 (1965). Appellant asserts that such a Fifth Amendment violation constitutes reversible error in this case. We disagree.

█ As the Supreme Court recognized in *Chapman v. California*, 386 U.S. 18, 22 (1967), "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction." In deciding whether the improper conduct or error was harmless, the determination which we as an appellate court must make is "absent the prosecutor's allusion to the failure of the defense to proffer evidence to [rebut the testimony], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting*, 461 U.S. 499, 510–11 (1983) (citing *Harrington v. California*, 395 U.S. 250, 254 (1969)).

In *United States v. Remigio*, 767 F.2d 730, 735 (10th Cir.1985) (quoting *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982)), we held that in applying the harmless error doctrine the following factors should be considered:

"1. The use to which the prosecution puts the postarrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions."

Applying the above factors which are relevant to the instant case, it is significant that the IRS agents' references to appellant's legal rights were made during the investigatory stage of the proceedings and not in a custodial or postarrest context. *See Beckwith v. United States*, 425 U.S. 341, 347 (1976). What appellant complains of is the prosecutor's attack on his asserted good faith belief that he did not believe wages were considered income. Part of the prosecutor's assertion was that, if appellant truly believed his wages were not

income, he would have questioned IRS personnel about this. In short, the use to which the prosecutor put appellant's silence and inaction centered on the *willfulness* element of a § 7203 violation.

■ At trial, the prosecutor asked Agent Seward whether appellant had turned over any books or records to the IRS. His answer was "No". The prosecutor, on redirect examination, asked Special Agent Admire whether appellant ever asked her any questions about income or wages. Her answer was "No". The final reference to appellant's silence to which he takes exception was the prosecutor's statement during closing argument:

> "Cheryl Admire told [appellant] on November 23rd, 1982 the same thing [that appellant was required to file] and in each and every one of those interviews, testimony from the agents and the testimony from the [appellant] was [appellant] didn't ask them any questions about that. He keeps saying, well I wanted answers and he never asked them. When he actually had a face-to-face interview, he never brought it up."

These attempts on the part of the prosecutor to rebut appellant's good faith defense by referring to appellant's failure to inquire whether wages were income and his failure to produce records are not as egregious as, for example, commenting on a defendant's failure to testify at trial or his silence after arrest and receipt of *Miranda* warnings. *See, e.g., Wainwright v. Greenfield*, 106 S.Ct. 634 (1986). Moreover, the three references at trial, on the issue of good·faith, did not permeate the prosecutor's case. We are satisfied beyond a reasonable doubt that the quantum of other evidence of appellant's willfulness and guilt supports the jury's verdict that appellant willfully failed to file tax returns.

The government introduced appellant's tax returns for the years 1975, 1976, 1977 and 1978, i.e. for the four years prior to the ones involved in the instant case for which he was charged with failure to file. Appellant acknowledged that he prepared those returns himself. He listed his wages as income for those years. He also received letters from the IRS which explained that his wages were income. He listed his wages as monthly income on a loan application with a savings and loan institution. In 1979 he filed a Form W–4 Employee's Withholding Allowance Certificate, claiming 60 allowances so that his employer would not deduct taxes from his wages. This case does not involve a confused or uneducated person. Nor does it involve a little known provision of the tax laws. We are convinced that, if any Fifth Amendment violation occurred, it was harmless. Absent the prosecutor's brief allusions to appellant's failure to ask IRS agents questions and his failure to produce records, it is clear to us beyond a reasonable doubt that the jury would have returned a verdict of guilty.

## II.

■ Appellant also asserts, as a subordinate claim of error, that the government's introduction of his tax liability for the three years for which he failed to file returns was admitted erroneously since it was irrelevant and prejudicial. He argues that, while gross income to establish that appellant was required to file a return is an element of a § 7203 violation, the actual amount of taxes claimed to be due is irrelevant and prejudicial. We find this argument to be without merit. Not only was there no prejudice in such evidence, but actual tax liability was relevant in this case because appellant's entire income was derived from wages. This was not a case where a taxpayer might have believed that allowable deductions offset his income and therefore might have believed, albeit erroneously, that he was not required to file a tax return. Moreover, the tax liability established that appellant was not entitled to claim 60 allowances on his W–4 forms. Such a manipulation is relevant on the issue of appellant's willful conduct. The court did not abuse its discretion under Fed.R.Evid. 403 in admitting this· evidence.

## III.

To summarize:

We hold that, even in the unlikely event that the prosecutor's allusions to appellant's failure to produce records or to inquire of IRS agents whether wages were income constituted a Fifth Amendment violation, such allusions were harmless under *United States v. Hasting, supra,* and *United States v. Remigio, supra.* Highly probative evidence of appellant's willfulness in not filing tax returns for three years clearly supported the jury's verdict of guilty. We also find without merit appellant's claim that the court abused its discretion in allowing the government to introduce evidence of appellant's tax liability.

Appellant was convicted on the basis of overwhelming evidence after a fair trial of serious offenses committed five to eight years ago in violation of the revenue laws of the United States. We order that the mandate issue forthwith.

AFFIRMED.[2]

---

2. Appellant's motion, filed prior to oral argument, to strike portions of the government's brief on appeal is in all respects denied.