**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tim THEMY, a/k/a Themostakis Kotronakis, a/k/a Dean Constantinos,
Defendant-Appellant.**

**No. 79–1186.**

United States Court of Appeals,
Tenth Circuit.

Argued May 8, 1980.

Decided June 27, 1980.

Steven W. Snarr, Asst. U. S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, with him on the brief), for plaintiff-appellee.

Brent D. Ward, Salt Lake City, Utah (John Preston Creer, Salt Lake City, Utah, with him on the brief), of Senior & Senior, Salt Lake City, Utah, for defendant-appellant.

Before BARRETT and DOYLE, Circuit Judges, and MILLER *, Judge.

* The Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

BARRETT, Circuit Judge.

Tim Themy appeals from his conviction upon jury verdicts of guilty to thirteen counts of mail fraud in violation of 18 U.S.C. § 1341.

The indictment charged that Themy devised a scheme and artifice to defraud and to obtain money from his victims by means of false representations relating to the quality and value of emeralds which Themy would provide; and that as a part of said scheme and artifice, Themy placed advertisements in several magazines distributed nationwide. Among the specific false representations alleged were that the emeralds were "good quality" stones "worth a minimum of $500 per carat". The indictment charged that Themy, in furtherance of the scheme and artifice to defraud, caused letters from several named victims to be delivered by mail to Themy's place of business.

### General Principles of Mail Fraud

18 U.S.C. § 1341 defines the crime of mail fraud as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [punished].

Mail fraud is established by proof that the defendant schemed to obtain mon-

ey by false representations, and that the mails were used in furtherance of the scheme. 18 U.S.C. § 1341; *United States v. Seasholtz*, 435 F.2d 4, 8 (10th Cir. 1970); *Beck v. United States*, 305 F.2d 595, 598 (10th Cir. 1962), *cert. denied*, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962), *cert. denied sub nom. Tuthill v. United States*, 371 U.S. 895, 83 S.Ct. 195, 9 L.Ed.2d 128 (1962).

■ With respect to the first element of the offense, the scheme, this Court has held that "[o]ne cannot be held to guilty knowledge of falsity of his statements simply because a reasonable man under the same or similar circumstances would have known of the falsity of such statements." *Elbel v. United States*, 364 F.2d 127, 134 (10th Cir. 1966), *cert. denied*, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967). However, indifference to the truth of statements made to induce others to action amounts to fraudulent intent. *United States v. Mackay*, 491 F.2d 616, 623 (10th Cir. 1973), *cert. denied*, 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974); *Elbel v. United States, supra*, at 134; *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir. 1965), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). And even though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations. *Sparrow v. United States*, 402 F.2d 826, 828 (10th Cir. 1968).

■ Direct proof of the fraudulent intent is not necessary. *United States v. Curtis*, 537 F.2d 1091, 1097 (10th Cir. 1976), *cert. denied*, 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976); *Gusow v. United States, supra*, at 756.

> As has been said many times, fraudulent intent is in many instances not susceptible of proof by direct evidence. In numerous cases it must be inferred from a series of acts and pertinent circumstances. One will not be heard to say that he did not intend the natural consequences of his conduct.

*Crosby v. United States*, 183 F.2d 373, 375 (10th Cir. 1950), *cert. denied*, 340 U.S. 906, 71 S.Ct. 274, 95 L.Ed. 656 (1950).

■ Whether a mail fraud defendant had the requisite criminal intent is, of course, a question for the jury. *United States v. Wolf*, 561 F.2d 1376, 1379 (10th Cir. 1977); *United States v. Seasholtz, supra*, at 8; *Beckwith v. United States*, 367 F.2d 458, 461 (10th Cir. 1966).

With these well-known principles in mind, we turn now to Themy's contentions.

### Contentions on Appeal

Themy contends:

I. The verdicts are not supported by the evidence, in that a) no evidence was presented that Themy represented the emeralds to be good quality stones worth $500 per carat, b) there was insufficient evidence of Themy's criminal or fraudulent intent, and c) the prosecution did not show that Themy's emerald marketing plan, considered as a whole and as it worked in practice, was fraudulent, but instead mischaracterized isolated instances of false advertising as a scheme to defraud; and

II. The District Court erred in refusing to give Themy's proposed instruction on good faith and "puffing" in full.

### I.

Themy contends the evidence does not support the verdicts, in that neither the false representations nor the scheme to defraud were proved.

■ As an appellate court reviewing a criminal conviction, we must view the evidence in the light most favorable to the prosecution. *United States v. Petersen*, 611 F.2d 1313, 1317 (10th Cir. 1979); *United States v. Curtis, supra*, at 1096; *United States v. Mackay, supra*, at 619. If substantial evidence supports the verdicts, they cannot be set aside. *United States v. Parnell*, 581 F.2d 1374, 1381 (10th Cir. 1978), *cert. denied sub nom. Cox v. United States*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979); *Gusow v. United States, supra*, at 759. The jury observed the prosecution and defense witnesses, appraised their credibili-

ty, determined the weight to be given to their testimony, drew permissible inferences therefrom, resolved conflicts in the evidence and reached ultimate conclusions of fact. Those are functions exclusively reserved to the jury as the trier of fact. *United States v. Waldron*, 568 F.2d 185, 187 (10th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *United States v. Nolan*, 551 F.2d 266, 274 (10th Cir. 1977), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977).

At trial, the prosecution depicted a shady venture in which low-grade emeralds would be sold to the public at highly inflated prices. The first step of Themy's plan, as thus presented, was to recruit a squad of salesmen through false magazine advertising and promotional literature. Each of the salesmen, having paid $100 or more for the right to participate in the venture, was to pose as a financially distressed private seller of prized gems. The plan was that the emeralds would "sell themselves" to unknowledgeable buyers eager to take advantage of a bargain.

Thirteen of Themy's victims and would-be salesmen testified for the prosecution. In twelve of the thirteen counts the victims responded by mail to one of several advertisements which Themy ran in nationally circulated magazines. The advertisements were important prosecution evidence. Each of the advertisements contained statements such as these:

> Mining of quality emeralds is diminishing hence their prices tripled during 1976. . . . With this plan, people knock on your door, you don't knock on theirs! . . . . You don't ask them to buy they buy on their own due to high quality and price . . . My prices start from $100 per carat! Amazing!! Especially when you compare my prices with those of the Jewelry trade where the November price index shows emeralds from $500 a carat upwards.
>
> * * * * * *
>
> People who see your ad or receive your letter on emeralds will start calling your home phone number wanting to come see and buy your emeralds. They'll buy them because the quality and price is unbeatable. . . . My emeralds are genuine, cut to near perfection. . . . Most amazing of all, however, are the prices. They start from $100 per carat. The majority of my emeralds are priced near the $100-per-carat figure! My emeralds at these prices don't need salesmen, they need public exposure. This is what my marketing plan is aiming at—public exposure. For your information, the precious gems industry's September-1976 price index shows emeralds priced from $500 to $12,000 per carat! Compare that with mine at $100 per carat! Can you see the future? What a mark-up, what a field for you to conquer. Once you join my plan, I'll be sending you every month the same price indexes, so that you can show to your customers.
>
> * * * * * *
>
> They buy them because the price and quality is unbeatable! . . . . My prices start from $100 per carat! Compare with the industry's September 1976 price index where they start from $500 to $12,000 per carat! Can you see the future? I'll send you copy of the price index, every month as it comes out.

In the remaining count, the victim studied Themy's promotional booklet describing the sales program in detail; thereafter, the victim mailed a letter to Themy asking to participate in his venture. The booklet contained this language:

> Talking about prices, take a look at the last page in this booklet. The industry's prices compared to mine is self-explanatory . . . . . . do you begin to see the future?

[Last Page]

Colored Stones Price Index

Current prices retail jewelers regularly pay dealers for their medium to better quality stones as reported by 15 typical importers

| Gemstone | Price Range Per Carat * * * | [Themy's] Prices |
|---|---|---|
| emerald, 1 ct. | $500–$12,000 | $100 |

Several of the victims testified that they received this promotional booklet from Themy. According to one witness, Themy represented during a telephone conversation that the emeralds were "fine quality" stones.

About half of the victim witnesses testified that they lost interest in the emerald sales plan the moment they saw a sample of the merchandise. None became salesmen.

The prosecution presented three jewelers who, in general, testified that the emeralds Themy provided his victims were very poor quality. The prosecution also presented the reports of two appraisers who examined three emeralds which Themy selected as representative of his stock. Both appraisers assigned a retail value of not more than $10 per carat to each of the three stones. A jeweler who testified for the defense examined several of Themy's emeralds and concluded that none was worth more than $100 per carat. Themy himself valued the emeralds at only $100 to $150, not $500, per carat.

Themy, a former railroad laborer and linen supply truck driver, did not have the formal training or professional experience needed to appraise his stock. Nevertheless, he offered to the public all but three or four stones of his stock of thousands without prior appraisal or examination by a qualified jeweler or gemologist. Apparently Themy never investigated what other retail dealers were demanding for stones of similar quality.

Especially telling was the evidence of one of Themy's standard rules for salesmen: "You are not permitted to solicit the jewelry trade." On cross-examination Themy refused to give any reason for the rule. A reasonable inference is that Themy kept his salesmen away from jewelers because he knew the inferior quality of the stones.

The defense theory was that Themy had acted in good faith, in that he believed that the salesmen who followed the emerald sales plan would make money. Themy testified that the plan had worked for him. Another witness testified that he joined the emerald sales program and made a profit of $600 in one week. A secretary employed by Themy testified that Themy conscientiously considered all demands for refunds. A number of refunds were made to would-be salesmen. This evidence, though considered by the jury, obviously did not compel an acquittal.

█ We hold there was substantial evidence that Themy made false representations as to the quality and value of the emeralds. The prosecution based its case in large measure on advertisements and promotional literature written by Themy. Themy did not state unqualifiedly that his emeralds were the same quality as those commonly sold for $500 per carat in the retail market. However, an advertisement is not to be read like a refrigerator repair manual. A good advertisement delivers its message by suggestion as clearly as by literal statement. In his advertisements, Themy associated phrases such as "high quality", "cut to near perfection", "unbeatable price", "what a mark-up", and others, with a challenge to compare the prices of his emeralds at $100 per carat with those of the "jewelry trade" starting at $500 per carat. The promotional booklet which Themy sent to those who responded to the advertisements was more explicit. There, Themy listed his prices alongside the higher prices which "retail jewelers regularly pay dealers for their medium to better quality stones".

The jury could find that Themy invited readers of these materials to believe that the emeralds to be supplied at $100 per carat were worth at least $500 per carat on the retail market. Thus, a reader who believed this might readily place faith in the success of the emerald sales plan and mail the $100 joinder fee. The jury could find that such was the very purpose of the representations.

In addition, we hold there was substantial evidence that Themy made the false representations with criminal intent, that is, with knowledge of the fact, or indifference to

the possibility, that the emeralds were not good quality stones and not worth $500 per carat.

 We reject Themy's contention that the conviction must be reversed because the prosecution focused its case on the false advertisements and promotional material, rather than the whole of Themy's marketing plan as it worked in practice. In our view, a pattern of material and false representations intended and used as a "come-on" to obtain money from the public through the mails, establishes a criminal scheme under 18 U.S.C. § 1341 regardless of whether the defendant hopes that responding members of the public will be satisfied with the product or service offered, and regardless of whether some members of the public are in fact satisfied.

## II.

The defendant objected to the District Court's proposed instruction on good faith and "puffing" and suggested the jury be instructed that "unfilled [sic] promises, prophecies, predictions and erroneous conjecture as to future events [do not constitute legal fraud] particularly where some relate to prospective profits from business operations." The Court overruled the objection on the ground that the defendant's proposed instruction was in substance the same as the Court's. The Court instructed the jury as follows:

> A scheme to defraud is not necessarily to be inferred from an unprofitable venture. Mere puffing, exagerated [sic] enthusiasm, and high-pressure salesmanship do not constitute legal fraud. However, an intent to defraud may be inferred where statements are made without regard to whether they are true or false or where promises are made recklessly without reasonable basis for belief that they can be fulfilled.

 We hold that the District Court did not err in submitting its "good faith" and "puffing" instruction to the jury. The crux of Themy's proposed instruction was that promises of business profits do not constitute fraud. However, the indictment and the prosecution's evidence went to the defendant's representations of fact—such as the quality and retail value of the emeralds.

WE AFFIRM.